|   |   |
|---|---|
| United States of America, | CR 09-0049-TUC-FRZ(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. |   |
| Michael Herrera-Guerrero, Mark Anthony Chacon, |   |
| Defendants. |   |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Defendant Michael Herrera-Chacon filed a Motion to Suppress (Doc. No. 26) on March 25, 2009. Defendant Mark Anthony Chacon filed Notices of Joinder (Doc. Nos. 28, 31) and Supplement to Joinder in Co-Defendant's Motion to Suppress (Doc. No. 37). The Government filed a Response To Defendant's Motion To Suppress Physical Evidence and Statements (Doc. No. 34) on April 9, 2009.

For the reasons stated herein the Magistrate Judge recommends that the District Court deny Defendant Herrera-Chacon's Motion to Suppress and Co-Defendant Chacon's Joinder in Co-Defendant's Motion To Suppress.

**I. CHARGES**

Defendants Michael Herrera-Guerrero and Mark Anthony Chacon are charged in a two count indictment with knowingly and intentionally conspiring to possess with the intent to distribute approximately 348 kilograms of marijuana on or about December 20, 2008 at or near Sonoita, Arizona in the District of Arizona, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B)(vii), (Count 1); and knowingly and intentionally possessing with the intent to distribute 348 kilograms of marijuana on or about December 20, 2008 at or near Sonoita, Arizona in the District of Arizona, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B)(vii).

## II. PROCEDURAL HISTORY

Defendant's Motion To Suppress and Co-Defendant's Supplement To Joinder In Co-Defendant's Motion To Suppress came on for hearing on April 14, 2009 and April 23, 2009. At the hearing U.S. Border Patrol Agent Robert Roddick (hereinafter "Agent Roddick") and U.S. Border Patrol Agent Joseph Montbriand (hereinafter "Agent Montbriand") testified for the Government and Defendant Michael Herrera-Guerrero for the defense.

## III. FACTUAL BACKGROUND

On December 20, 2008, Agent Roddick was assigned to the checkpoint on Highway 83 north of Sonoita. (Suppression Hearing April 14, 2009, Agent Roddick Testimony at p. 11 (hereinafter "Supp. Hrg. 1 at p.__")). At 9:40 a.m. a sensor alerted Agent Roddick at the checkpoint of multiple vehicles on a dirt road which exits west, south of the Highway 83 checkpoint, and enters back onto Highway 83 north of the checkpoint.[1] (*Id.* at pp. 15, 16, 28). The distance on the Road from the exit on Highway 83 to the entry back onto Highway 83 is 3.3 miles. (*Id.* at 22). The distance on Highway 83 from the exit to the entry is 2.3 miles. (*Id.*) Agent Roddick drove north one third of a mile from the checkpoint on Highway 83 to the Road entry and west one-half mile to the intersection of E. Greaterville Road and Old Sonoita Highway. (*Id.* at pp. 28, 38, 105). It took Agent Roddick a minute and a half to arrive at the point where he parked. He parked on the west side of Old Sonoita Highway facing southeast in an unmarked, government-plated white Ford pickup normally used by Border Patrol dog handlers. (*Id.* at pp. 11, 44, 53, 85, 97-98). He was wearing the standard Border Patrol green uniform. (*Id.* at pp. 54-55).

Agent Roddick waited there for two minutes before two vehicles approached his position from the south on the Road. (*Id.* at p. 106). It normally takes six to eight minutes

---

[1]Due west from Highway 83 the road is called E. Singing Hills Trail, veering to the right going north as Antelope Place, winding into S. Wild and eventually becoming Old Sonoita Highway back to Highway 83. The Old Sonoita Highway is intersected by E. Greaterville Road one-half mile from Highway 83 and is paved from that point to Highway 83. (Government Exh. 1, hereinafter "the Road").

- 2 -

1  to traverse the entire Road. (*Id.* at p. 26). Based on the timing to drive to and wait for vehicles
2  to pass by, Agent Roddick surmised that the two vehicles were the same ones that tripped the
3  sensor. (*Id.* at p. 31). The vehicles Agent Roddick observed were a white Ford Explorer, later
4  determined to be driven by Defendant Chacon, followed by a blue Ford Explorer, later
5  determined to be driven by Defendant Herrera-Guerrero. (*Id.* at p. 30). The Ford Explorers
6  were traveling at 10 mph, thirty to forty-five feet apart. (*Id.* at pp. 34, 55, 107). As the two
7  vehicles approached Agent Roddick's position, the drivers of the two Ford Explorers
8  appeared nervous and agitated seeing him at the intersection. (*Id.* at p. 31). Both Ford
9  Explorers passed fifteen feet from him. (*Id.* at p. 55). The driver of the white first Ford
10 Explorer was seen to grip the steering wheel nervously, staring straight ahead and not
11 looking at Agent Roddick. (*Id.* at p. 33). In Agent Roddick's experience, people from the
12 area will wave hello or at the very least notice him. (*Id.* at p. 34). The driver of the blue
13 second Ford Explorer gave a quick wave and appeared "jumpy and nervous and unhappy."
14 (*Id.* at p. 32).

15  Agent Roddick pulled in behind the blue second Ford Explorer, calling Agent
16 Montbriand as backup, and followed it for one-half mile, or approximately one minute, to
17 Highway 83. (*Id.* at pp. 31, 35, 38). During the time that Agent Roddick followed the blue
18 second Ford Explorer, the driver tapped the brakes, varied his speed between 10 mph to 25
19 mph, and utilized the turn signal when there was no turn in the Road and, in Agent Roddick's
20 opinion, there was no apparent reason to do so. (*Id.* at pp. 39, 63-64). Agent Roddick checked
21 the blue second Ford Explorer's registration and determined it to be registered out of Tucson
22 and that it was not a stolen vehicle. (*Id.* at pp. 37, 60).

23  The two Ford Explorers as well as Agent Roddick turned left to go north on Highway
24 83. As soon as Agent Roddick turned to go north on Highway 83, Agent Montbriand passed
25 him and positioned himself behind the white first Ford Explorer. (*Id.* at p. 41). Agent
26 Roddick followed the blue second Ford Explorer from approximately two or three car lengths
27 for one and three-quarter miles on Highway 83 at which time he turned on emergency
28 equipment to effect a stop of the blue second Ford Explorer. (*Id.* at pp. 42, 63, 64).

1  Once stopped, Agent Roddick approached the blue second Ford Explorer driver side 2 on foot and saw bundles of marijuana, including one on the passenger seat next to the driver, 3 detained Defendant Herrera-Guerrero, and called Agent Montbriand regarding the discovery 4 of marijuana in the blue second Ford Explorer. (*Id.* at pp. 43-44). The white first Ford 5 Explorer was stopped and marijuana found therein as well.

6  The myriad of factors cited by the Government as giving rise to Agent Roddick's 7 reasonable suspicion to believe that crime was underfoot are: (1) the Road can be driven to 8 avoid the checkpoint (*Id.* at p. 32); (2) there are other roads that can be used to circumvent 9 the checkpoint but this Road is the shortest in distance (*Id.* at p. 40); (3) the Road has no 10 places of interest, i.e., stores, shops, businesses (*Id.* at p. 33); (4) he is familiar with the 11 immediate residents of the area and did not recognize either Defendant or the two Ford 12 Explorers (*Id.* at p.32); (5) the two Ford Explorers appeared to be driving in tandem based 13 upon tripping the sensor at the same time and arriving at the intersection of E. Greaterville 14 Road and Old Sonoita Highway at the same time (*Id.* at p. 31); (6) based upon the location 15 of the tripped sensor and the arrival of the two Ford Explorers when first seen, Agent 16 Roddick surmised that neither vehicle had stopped between those two points (*Id.* at pp. 31, 17 34); (7) the fact that large capacity vehicles are used to smuggle drugs (*Id.* at p. 34); (7) the 18 fact that two men, each driving similar SUVs, appeared to be driving together struck Agent 19 Roddick as odd (*Id.* at p. 34); (8) the blue second Ford Explorer's registration out of Tucson 20 indicated (a) it was not from the local area, (b) there was no apparent reason for being in the 21 neighborhood utilizing the Road and (c) it did not stop for any reason, which suggested 22 smuggling to the Tucson area as in past incidents (*Id.* at pp. 37-38); (9) the nervous behavior 23 of both Defendants as they drove by, albeit one acknowledging his presence and the other 24 not (*Id.* at pp. 31,32,33); (10) four arrests in the preceding four days of smugglers utilizing 25 the Road to circumvent the checkpoint (*Id.* at p. 37); (11) otherwise minimal traffic on the 26 Road around the incident date of December 20, 2008 (*Id.* at p.97); and (12) Defendant 27 Herrera-Guerrero, as driver of the blue second Ford Explorer, tapped his brakes, varied his 28 vehicle speed, and inappropriate used his turn signal (*Id.* at pp. 39, 64).

- 4 -

## IV. ANALYSIS

Law enforcement can stop and briefly detain a person for investigative purposes based upon reasonable suspicion, shy of probable cause, supported by articulable facts that criminal activity is underfoot. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Brief investigatory stops extends to stops of vehicles. *United States v. Cortez*, 449 U.S. 411. 417-418 (1981). Reasonable suspicion is based upon the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Sokolow*, 490 U.S. 1 (1989).  Thus, when determining whether reasonable suspicion exists, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu,* 534 U.S. at 273. Such an analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them, that might well elude an untrained person."*Id.* (citations omitted). However, the inferences that officers draw based upon their training and experience "must also be grounded in objective facts and be capable of rational explanation." *United States v. Rojas-Millan*, 234 F.3d. 464, 469 (9th Cir. 2000).

Factors to be considered in determining whether "reasonable suspicion" exists to justify stopping a vehicle include but are not limited to: (1) characteristics of the area: (2) proximity to the border; (3) usual patterns of traffic and time of the day; (4) previous drug smuggling in the area; (5) behavior of the driver; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience. *Brignoni-Ponce,* 422 U.S. at 885. It is not necessary for all the factors to be present for reasonable suspicion to exist and other factors may be relevant. *United States v. Magana,* 797 F.2d 777, 780 (9th Cir. 1986).  The question is whether each of the factors, when taken together, warrant further investigation. *Arvizu,* 534 U.S. at 274.

The inquiry herein regarding reasonable suspicion is close because it largely involves facts consistent with innocent activity as criminal activity. The types of vehicles driven by Defendants are not inherently suspicious. *See United States v. Rodriguez*, 976 F.2d 592 (9th

- 5 -

1  Cir. 1992), *amended*, 997 F.2d 1306 (9th Cir. 1994).  Moreover, the seemingly contradictory
2  claim by Agent Roddick that Defendant Chacon in the white first Ford Explorer not looking
3  at him as he passed by is as suspicious as Defendant Guerrero, following in the blue second
4  Ford Explorer, looking at him and waving as he passed by, is a wash.

5  Ultimately, apparent efforts to avoid checkpoints combined with other factors can
6  constitute "reasonable suspicion." *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1493
7  (9th Cir. 1994) *overruled on other grounds by United States v. Montero-Camargo,* 208 F.3d
8  1122 (9th Cir. 2000); *United States v. John Doe*, 701 F.2d 819 (9th Cir. 1983); *United States
9  v. Roberts*, 470 F.2d 858, 859 (9th Cir. 1972). Location of the checkpoint south of the Road
10 exit from Highway 83 or north of the Road entry onto Highway 83 to stop vehicles going
11 northbound would otherwise require even less than reasonable suspicion. However, the
12 ostensible reason for the checkpoint's location in the instant case is:

> Q. [The Court] Okay. Is there a particular strategic reason why it's placed there as opposed to closer to or even further south?
> A. [Agent Roddick] There are certain Department of Transportation requirements, that there has to be a certain stretch of straight road, I think, or something to that effect. I'm not familiar with all their requirements, but I know they're incumbent upon the DOT restrictions.

(Supp. Hrg. 1 at p. 105). Herein, Border Patrol did not create the situation it deems suspect.
*See United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2002)("Certainly,
an agent cannot create a situation which amounts to a dangerous condition, observe the driver
react appropriately, and then base reasonable suspicion on the reaction because it somewhat
comports with 'suspicious behavior.'").

The agents herein were alerted by sensors detecting vehicular traffic utilizing a dirt
road in a sparsely-populated area. The vehicles observed, similar in make and model, were
in close proximity to one another sufficient to suggest they were driving in tandem.  Based
upon the time elapsed from when the sensor alerted, to when he observed the two vehicles,
indicated to Agent Roddick that the two vehicles were the only ones known to have been in
the sensor-surveillance area near the time of the sensor alert. *See United States v. Mora-
Chavez*, 496 F.2d 1181 (9th Cir. 1974). Neither the similar make and model vehicles nor their

sole occupant drivers were known from the immediate locale to Agent Roddick. Agent Roddick had experienced a recent spate of arrests of drug smugglers circumventing the checkpoint by utilizing the Road, and had past encounters with drug smuggling vehicles from Tucson. Agent Roddick observed the driver of the blue second Ford Explorer he was following tap his brakes, vary his vehicle speed and inappropriately use his turn signal indicating nervousness on the part of the driver.

## V. CONCLUSION

The totality of the circumstances lead to a reasonable conclusion that the drivers of both Ford Explorers, acting in tandem, were attempting to circumvent the checkpoint. Agent Roddick's prompt response to the sensor alert and observation of the approaching vehicles was well-advised and based on a founded and reasonable suspicion. The record herein discloses circumstances which moved Agent Roddick in the reasonable exercise of his duties to the action taken and the Court need not look for a reconstructed, after-the-fact explanation of what may have been nothing more than innocent conduct by Defendants at the time of the incident.

## VI. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant Herrera-Guerrero's Motion to Suppress (Doc. No. 26) and Defendant Chacon's Notice of Joinder (Doc. Nos. 28, 31, 37).

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 09-049-TUC-FRZ.**

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 20th day of May, 2009.

_____
Héctor C. Estrada
United States Magistrate Judge

- 7 -